**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| SANDRA LOMBARD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FISERV, INC., MICHAEL LYONS, and ROBERT HAU,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Sandra Lombard ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendant Fiserv, Inc. ("Fiserv" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, Fiserv common stock during the period from July 23, 2025 through October 28, 2025, inclusive (the "Class Period"), who were damaged thereby (the "Class"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10 b-5.

2. Fiserv is a leading global provider of payments and financial services technology. It operates at the intersection of banking and commerce, serving merchants and financial institutions through its portfolio of payment-processing, digital banking solutions, and point-of-sale technologies.

3. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material facts. After Defendant Lyons assumed the role of CEO in May 2025, he assured investors on July 23, 2025 that Fiserv's 2025 guidance had been adequately "refined" to reflect the fact that some "launches and initiatives are taking longer than we had

planned." As a result, Defendants slightly lowered Fiserv's full year organic revenue growth guidance to approximately 10%, the lower end of its previous guidance of 10 to 12%, but assured investors that Fiserv remained on-track for growth. Investors were unaware that Defendant Lyons had not fully evaluated Fiserv's financial outlook and ability to meet those expectations.

4. On October 29, 2025, Fiserv shocked investors by significantly slashing its guidance for 2025, lowering full year organic revenue growth from the 10 to 12% recently represented to between 3.5 and 4%, and projecting 2025 earnings of no more than $8.60 per share, compared to its prior view of $10.15 to $10.30 per share, which represents a decrease of almost 17%. Fiserv also revealed that organic revenue growth was only 1% for the quarter, a sharp decrease from the 8% in the previous quarter and indicating a downward trend. Its earnings fell significantly short of analysts' sales and net income projections.

5. In an earnings call on the same date, Defendant Lyons stated that "financial surprises" emerged in the start of the third quarter, that "prompted not just the annual strategic planning process, but this much more rigorous review into our financials." Defendant Lyons admitted that Fiserv had embedded unrealistic assumptions in its guidance regarding volume growth, sales activity and broad productivity improvements, "all of which would have been objectively difficult to achieve, even with the right investment and strong execution." He further explained that in recent years, Fiserv had deferred investments and cut costs to improve short-term profit margins. Those decisions "are now limiting our ability to serve clients in a world-class way, execute product launches to our standards and grow revenue to our full potential."

6. In addition to the disappointing results and slashed guidance, Fiserv also announced a massive overhaul of its management team and board of directors, with a new strategic action plan called One Fiserv. Fiserv appointed Takis Georgakopoulos, Fiserv's COO, and Dhivya

Suryadevara, a former United Healthcare Group executive, as new co-presidents to lead the Company's two main business divisions: Merchant Solutions and Financial Solutions. Fiserv also added Paul Todd, former CFO of Global Payments, as its new CFO and announced three new appointments to its board of directors. Defendant Hau, Fiserv's current CFO, and two board members (independent chairman Doyle Simons and audit committee chair Kevin Warren) were all abruptly announced to be leaving the Company in early 2026. Moreover, in conjunction with this news, Fiserv announced that its stock would be transferred from the NYSE to the Nasdaq on or about November 11, 2025.

7. On this news, the price of Fiserv's common stock collapsed by about 44%, or \$55.57 per share, from a closing price of \$126.17 per share on October 28, 2025 to \$70.60 per share on October 29, 2025. This was Fiserv's largest one-day fall on record and a seven-year low for its stock price, erasing \$30 billion in market value.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

10. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its U.S. corporate headquarters located in this District and conducts substantial business here.

12. In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13. Plaintiff, as set forth in the accompanying certification, which is incorporated by reference herein, purchased Fiserv common stock during the Class Period and has been damaged thereby.

14. Defendant Fiserv, Inc. provides payments and financial services technology solutions. The Company's headquarters is in Milwaukee, Wisconsin and its common stock trades on the NYSE under the ticker symbol "FI."

15. Defendant Michael Lyons ("Lyons") has officially served as Chief Executive Officer ("CEO") of Fiserv since May 6, 2025, after serving as President and "CEO-elect" since January 27, 2025.

16. Defendant Robert Hau ("Hau") has served as Chief Financial Officer ("CFO") of Fiserv since 2016. Effective October 31, 2025, he will be succeeded as CFO by Paul Todd and will act as a special advisor during the transition in the first quarter of 2026.

17. Collectively, Defendants Lyons and Hau are referred to throughout this complaint as the "Individual Defendants."

18. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly

reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

19. Fiserv and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

20. Fiserv is a multinational financial technology company that primarily serves other companies in the financial services sector. Fiserv provides processing services, including debit and credit card transactions, loyalty programs, loans, electronic bill pay, wires and ACH transfers, check deposits, and ATM transactions for banking institutions, which represent the majority of its revenue. Fiserv also provides product services, including software, hardware, and physical credit and debit cards.

21. Defendant Lyons joined Fiserv as President and "CEO-elect" in January 2025, to prepare for the appointment of then-CEO Frank Bisignano as Commissioner of the Social Security Administration. During his time as "CEO-elect," investors were assured of a smooth transition. At the Wolfe Research FinTech Forum on March 11, 2025, Defendant Hau answered analyst questions about this topic, including the impact to the strategic direction of Fiserv or its management style. Defendant Hau assured investors that Defendant Lyons "knows the company

quite well" and "Mike has been quite clear, both internally and externally, ***don't expect a big unveil is his term. He's not changing direction of the company***."

22. Defendant Hau also revealed that despite his appointment in January 2025, Defendant Lyons's internal transition period was only about ten days, until "Frank [Bisignano] declared the transition over, internally" and "Mike and I are now leading the company together." After Bisignano departed in May 2025, he had completely divested his stock ownership from Fiserv by July 1, 2025, which included common stock, options, restricted stock units and performance equity grants for over $500 million.

23. Fiserv's next earnings call, for its second quarter 2025 results on July 23, 2025, was Defendant Lyons's first official quarterly earnings report as CEO of the Company. While he would later reveal that Fiserv's guidance would be unattainable, he spoke positively about Fiserv's second quarter results and only lowered organic revenue growth to the lower end of the Company's previous guidance of 10 to 12%. Defendant Hau affirmed these statements, and assured investors that Fiserv was only "raising the bottom end of our adjusted earnings per share guidance range to $10.15 from $10.10, while maintaining the high end of the range at $10.30."

24. Defendant Lyons also reaffirmed the stability of his transition and that he had adequate time to learn about the Company, having "been in the seat for about 10 weeks now." He assured investors that, "I've had the opportunity to better understand the key drivers of our business, the status on the strategic initiatives and then what was embedded in the full year guidance."

25. As a result of Defendants' misstatements and omissions reassuring investors that Fiserv's earnings and growth would only lower slightly in the third quarter, but largely remain on track for both the third quarter and full year 2025, investors were unaware that these expectations

were unachievable from the start. As a result, Fiserv would soon undergo a complete business overhaul, necessitating a plan called "One Fiserv," the departure of Defendant Hau and numerous directors in early 2026, and that Fiserv's stock would no longer trade on the NYSE.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

26. The Class Period starts on July 23, 2025, when Fiserv reported its financial results for the second quarter of 2025. During Fiserv's earnings call on the same date, Defendant Lyons spoke positively about Fiserv's financial results and provided minor adjustments, stating:

> For the second quarter, we delivered 8% adjusted and organic revenue growth and strong 16% adjusted EPS growth. We expanded our adjusted operating margin and generated good free cash flow. Importantly, we returned $2.2 billion to shareholders in the quarter by repurchasing 12.2 million shares or 26% more than we repurchased in Q1. ***And as Bob will cover later, we have increased our 2025 share repurchase guidance to approximately 130% of free cash flow. This means we expect to continue actively buying shares in the second half of the year, all while staying within our targeted leverage range.***
>
> Before Bob walks you through our financial performance in more detail, I'd like to provide some color around the refinements we made to our guidance and share some important business highlights from the quarter. The 2025 guidance, which called for 10% to 12% organic revenue growth on top of the 16% growth we achieved in 2024, had always assumed a significant growth ramp on the back half of the year. This trajectory was based on the successful launch of a long and granular list of new products and strategic initiatives as well as a relatively strong macroeconomic outlook.
>
> ***Our updated guidance reflects the fact that some of those launches and initiatives are taking longer than we had planned. Some of that is on us and some is driven by other factors that we don't fully control, but we are confident that we will capture the full strategic and financial benefits and only the timing of realizing them has been extended.*** And to a lesser degree, our update reflects economic conditions that we have seen versus what had been assumed in the plan. As a result, ***we have refined our full year organic revenue growth guidance to approximately 10%, which is at the low end of our guidance range.*** And to be clear, we are maintaining our guidance for $3.5 billion of Clover revenue this year. ***With this revised ramp in revenue growth in the back half, continued margin improvement and the increased share repurchase guidance, we are also refining our adjusted EPS guidance by raising the bottom end of our range by $0.05.***

27. Defendant Lyons also assured investors about Fiserv's stability and leadership, stating:

> Overall, I'm encouraged by our positioning and opportunity set as I look out over the next several years. We are hard at work fine-tuning our strategy carefully listening to our clients and investing for where we think the industry is headed. ***We are privileged to have a leadership position across many of our businesses, and we are confident we can deliver consistent, durable growth and value to our shareholders.*** I look forward to diving into my first annual strategic planning cycle with the Fiserv team in the coming weeks and to sharing more with you on how we'll extend our leadership into the next generation of commerce, payments and financial technology.

28. On the same call, Defendant Hau also spoke about Fiserv's results, stating:

> ***We delivered another strong quarter, highlighting our consistent ability to grow revenue and expand margin.*** Second quarter total company adjusted revenue grew 8% to $5.2 billion and adjusted operating income grew 12% to $2.1 billion, resulting in an adjusted operating margin of 39.6%, an increase of 120 basis points versus the prior year. For the first half of the year, adjusted revenue grew 7% to $10 billion, and adjusted operating income grew 11% to $3.9 billion, resulting in an adjusted operating margin of 38.7%, an increase of 150 basis points versus the prior year. Organic revenue grew 8% in the quarter, driven by solid performance in both segments. Through the first 6 months, organic revenue also grew 8%.
>
> ***Second quarter adjusted earnings per share was $2.47, compared to $2.13 in the prior year, up 16% and in line with our full year growth guidance of 15% to 17%. Year-to-date, our adjusted earnings per share increased 15% to $4.61 compared to $4 in the prior year.*** Free cash flow for the quarter was $1.2 billion and $1.5 billion for the first half of the year. As we said in previous earnings calls, we expect an increase in free cash flow in the back half of the year, which reflects typical seasonality for us, including the timing of inflows related to the green tax credit initiative. We continue to expect approximately $5.5 billion of free cash flow.

29. Defendant Hau also stated:

> ***We are raising the bottom end of our adjusted earnings per share guidance range to $10.15 from $10.10, while maintaining the high end of the range at $10.30. The change reflects the refining of our organic revenue growth expectations to the bottom of our prior guidance range, offset by the benefit of higher share repurchase activity.*** We continue to expect an acceleration in organic revenue growth for the second half of the year particularly in the Merchant Solutions segment. Based on this, ***we expect both segments to grow towards the low end of their guidance ranges for organic revenue growth with Merchant Solutions towards the low end of the 12% to 15% organic revenue growth outlook for the year and Financial Solutions organic revenue growth at the low end of the 6% to***

> ***8% range. The net effect will be expected total company organic revenue growth of approximately 10% at the bottom end of our original guidance of 10% to 12%.***
>
> Lastly, we're modifying our adjusted operating margin guidance by 25 basis points, guiding to approximately 100 basis points rather than at least 125 basis points of adjusted operating margin expansion this year. The change reflects the projected impact of the 4 recently completed acquisitions, the refined organic revenue growth rate and investments to support new product launches and implementations. We anticipate margin improvement on these acquisitions as we work through integration and synergies that will benefit next year and beyond.

30. In response to an analyst's question about Fiserv's overall growth rates and the "expectations change[,]" Defendant Lyons stated:

> Yes. It's Mike. I'll start. Just on the overall organic growth rate for the company, we obviously refined to approximately 10% from 10% to 12%. Just a couple of comments there. ***I've been in the seat for about 10 weeks now. I've had the opportunity to better understand the key drivers of our business, the status on the strategic initiatives and then what was embedded in the full year guidance. And that full year guidance always anticipated a big ramp in growth in the back half of the year based on the rollout of a whole bunch of projects and initiatives. It was a granular list. It's a very strong list that we had the ability to re-underwrite, study all of our initiatives, and they are great initiatives. It's just a matter of the timing of getting them to market.***
>
> So as I said a minute ago, ***we're still confident we'll get the full financial and strategic benefits of all those initiatives. And it's just a matter of timing. And again, we feel very good about them.*** The pipelines around the products that we're coming to market with are very strong. The clients want them. The technology is good. So we feel very good about it. ***So the refinement from 10% to 12% to 10% is just having the benefit of 6.5 months into the year, understanding where we are in those product rollouts and then importantly, understanding how we want to roll them out with the quality which we want to roll them out. So forecast from here indicates back half of the year growth of 12%, which led us to -- at the original range at the lower end of that original range. And that's the type of transparency we want to give you as we go through the year and see stuff and are able to narrow the range and the variability around it.*** So going into a couple of products.

31. In response to another analyst's question about "what initiatives are being extended exactly" and how "some of it was on Fiserv[,]" Defendant Lyons responded:

> Yes. As I was just saying, we went into the year, the year was built on a back half of the year plan with a lot of granular, very attractive, very compelling initiatives, no major 1 or 2 items, but a very long list of initiatives. And as you go through the

planning and have the benefit of half the year and you look at where the rollout of those initiatives are in terms of timing and how we want to do it in terms of quality for the client, scalability and a client-first mindset***. And then you roll forward the rest of the year, it puts us at the bottom end of the original 10% to 12% range just in getting those products to market and realizing the revenues.*** There isn't a quality issue with them. It's not products that have gone to market and not generated the revenues we thought it's just getting the products to market. And as I said, some of that we control. We can execute faster, better, greater sense of urgency and some of it we don't because we're integrating with partners, contract signings, how do people respond to an uncertain macro in the second quarter, obviously, more clear now.

So lots of factors that go in there. ***what we did with this is we said when you look at our most current plan in the rest of the year, we're confident that we've captured what we will roll out and realize in revenues this year.*** And then importantly, as you go forward, all of those initiatives, as I said, we've had a great chance to re-underwrite them, restudy them, and they're good. They're really great products, whether we're redefining how small businesses manage cash with CashFlow Central. We're resetting the parts of how small businesses run their businesses off the Clover platform and the attributes we're going to there. We're introducing a digital payment trail, FIUSD. These are all great products resetting our digital platform in banking.

So we like all the products***. It's just we're giving you the most updated look on timing. And obviously, when we started the year, you give a wider range. And as you go through the year and get a better sense of where things are, we're able to narrow the range a little. I think to a lesser extent, we started the year with some macro assumptions around certain activity levels in parts, more so in the FI business where card accounts on file would rebound off a cyclical low. You'd see greater activity in certain of the digital payment sites and maybe a faster and more robust upgrade cycle in certain parts of core and surround bank technology. And obviously, while it's strong today, the economy has taken an uneven path to get here, and we just factored that into the future outlook.*** Hopefully, that helps.

32. Defendant Hau also elaborated, stating in relevant part:

I think the way I think about it is our original guidance at 10% to 12%, our baseline plan was midpoint, 11%. To get to 12%, we factored in the opportunity for a slightly better macro environment, a little bit faster business, some of the credit and course surrounds that Mike just talked about that would have gotten us a little bit faster, stronger would have gotten us to the top end. ***And now that we've seen a bit choppier recovery in the macro economy, a little bit slower on the initiatives, again, both on things inside and outside of things in our control and outside our control, a little bit slower, puts us at the bottom end of the range, which is what we're guiding to at this point.***

33. The statements referenced above in ¶¶26-32 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to Fiserv's revenue performance and growth, which were known to Defendants or recklessly disregarded by them as follows: (a) Fiserv's financial guidance and expectations for the third quarter and full year 2025 were tainted by incremental assumptions that were "objectively difficult" to achieve even with the right investment and strong execution, including outsized business volume growth, record sales activity and broad-based productivity improvements; (b) Fiserv's recent financial results over-relied on short-term initiatives and not recurring revenue; and (c) Defendant Lyons was not adequately prepared to issue Fiserv's 2025 financial results and guidance by July 2025.

34. The truth was revealed on October 29, 2025, when Fiserv revealed its unexpectedly low third quarter 2025 earnings, reporting non-GAAP earnings per share of $2.04, missing estimates by more than 60 cents, and revenue of $4.92 billion, almost half a billion dollars below expectations. Beyond the third quarter, Fiserv also slashed its guidance and revealed stagnated growth. Fiserv's adjusted earnings per share was cut to between $8.50 and $8.60, compared to the previous range of $10.15 to $10.30 recently affirmed by Defendants Lyons and Hau. Organic revenue growth, guided to be "approximately 10%" on Fiserv's previous earnings call, and discussed extensively by Lyons and Hau, was cut to 3.5% to 4%.

35. Between Fiserv's two business segments, its Financial Solutions performance was particularly disappointing and decreased by 3% year-over-year, with digital payments falling by 5%, issuing up by only 1%, and banking down by 7%. The banking subgroup was previously a stable, recurring-revenue piece of Financial Services, making its decline particularly surprising. Margins in Financial Solutions also fell to 42.5%, compared to 49% in the previous quarter.

36. In an earnings call on the same date, Defendant Lyons explained:

> July, as part of my transition as CEO, we revised down some of these elevated expectations with a specific focus on critical new product launches, to better reflect what was achievable based on the work we had completed at the time. However, as we pursued a much broader and deeper full company analysis in Q3, it became clear that there were incremental assumptions embedded in our guidance, including outsized business volume growth, record sales activity and broad-based productivity improvements, all of which would have been objectively difficult to achieve even with the right investment and strong execution.
>
> * * *
>
> And the fourth and final factor is that Fiserv's recent results have increasingly relied on short-term initiatives. These initiatives place too much emphasis on pursuing in-quarter results as opposed to building long-term relationships by prioritizing business that both meets our clients' needs and comes with high recurring revenue. As a result, we have made the decision to deprioritize the short-term revenue and expense initiatives which, of course, has some near-term impact on our growth and profitability.

37. In tandem with the disappointing results and outlook, Fiserv also announced a broad management overhaul, with new co-presidents, a new CFO, a new board chairman, and new independent directors. The Company also told investors that its stock would be transferred from the NYSE to the Nasdaq in November 2025.

38. On this news, Fiserv's stock immediately collapsed by about 44%, or $55.57 per share, to close at $70.60 per share on October 29, 2025.

39. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**ADDITIONAL SCIENTER ALLEGATIONS**

40. As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to

the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Fiserv's common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Fiserv, their control over, and/or receipt or modification of, Fiserv's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Fiserv, participated in the fraudulent scheme alleged herein. The adverse events at issue also involved overstating the Company's most important financial metrics, fundamental growth strategy, and resulted in Defendant Lyons conceding that Fiserv needed a "critical and necessary reset" and deep changes, including an overhaul of numerous directors and the CFO.

41. As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

**LOSS CAUSATION/ECONOMIC LOSS**

42. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

43. On October 29, 2025, Fiserv announced disappointing third quarter results, slashed its annual earnings guidance, and announced a broad reshuffling across its senior ranks. Fiserv now expects adjusted earnings of $8.50 to $8.60 a share for the year, down from a previous forecast of $10.15 and $10.30. Revenues are expected to grow 3.5% to 4%, versus a prior estimate of 10%. Adjusted earnings came in at $2.04 per share, falling short of the LSEG estimate of $2.64. Revenues rose about 1% from a year ago to $4.92 billion, missing the $5.36 billion forecast. Net income grew to $792 million from $564 million in the year-ago period. Fiserv would also

implement an overhaul of its business strategy, leadership, and its stock would be transferred from the NYSE to the Nasdaq.

44. On this news, the price of price of Fiserv's common stock dropped by about 44%, or $55.57 per share, from a closing price of $126.17 per share on October 28, 2025 to $70.60 per share on October 29, 2025.

45. The decline in Fiserv's stock price is directly attributable to these announcements of its complete business overhaul, poor third quarter 2025 results, lack of growth, and that its guidance would have been "difficult to achieve even with the right investment and strong execution."

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

46. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this complaint against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

47. In the alternative, Plaintiff is entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b) The omissions and misrepresentations were material;

c) The Company's common stock traded in efficient markets;

d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e) Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

48. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

49. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

50. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Fiserv common stock between July 23, 2025 through October 28, 2025, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the

Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

53. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a) Whether Defendants violated the Exchange Act;

b) Whether Defendants omitted and/or misrepresented material facts;

c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e) Whether the price of the Company's stock was artificially inflated; and

f) The extent of damage sustained by Class members and the appropriate measure of damages.

54. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

55. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**
**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

60. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**
**For Violations of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

61. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62. Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C. Awarding Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

D. Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: November 14, 2025

Respectfully submitted,

*/s/ Jacob A. Walker*

Jeffrey C. Block (application for admission forthcoming)
Jacob A. Walker
Sarah E. Delaney (application for admission forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com

*Counsel for Plaintiff*